**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **CINDY KLEGER**, et al., | * | |
| *Plaintiffs*, | * | |
| v. | * | **Civil Case No: 1:24-cv-00095-JMC** |
| **DORCHESTER COUNTY,** | | |
| **MARYLAND,** *et al.*, | | |
| | * | |
| *Defendants.* | | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

**MEMORANDUM OPINION AND ORDER**

Plaintiffs, Cindy Kleger (individually and as the personal representative of the Estate of Wyatt Allan Young) and Roger Allan Young, initiated the present lawsuit on January 10, 2024, against Dorchester County, Maryland ("Dorchester County"), Don Satterfield,[1] Davion Jammal Batson, Marquet Robinson, Arthur Nelson,[2] and "additional unidentified officers" alleging violations of 42 U.S.C. § 1983, the Maryland Declaration of Rights, negligence, gross negligence, wrongful death, survivorship, and negligent supervision. (ECF No. 1). Before the Court are several motions: (1) Defendant Batson's Motion for Summary Judgment (ECF No. 94); (2) Defendant Dorchester County's Motion for Summary Judgment (ECF No. 96); (3) Defendant Robinson's Motion for Summary Judgment (ECF No. 97); (4) Plaintiffs' Conditional Motion to Amend/Correct the Complaint (ECF No. 120); and (5) Plaintiffs' Motion to Strike, or in the alternative, for Limited Discovery and a Sur-Reply. The motions are fully briefed (ECF Nos. 94, 96, 97, 102, 104, 106, 116, 118, 119, 120, 121, 124, 127) and no hearing is necessary. *See* Loc. R.

---

[1] The Court previously approved Plaintiffs' notice of voluntary dismissal regarding Defendant Satterfield. *See* (ECF Nos. 53, 54).

[2] The Court previously approved Plaintiffs' notice of voluntary dismissal regarding Defendant Nelson. *See* (ECF Nos. 87, 88).

105.6 (D. Md. 2025). For the reasons that follow, Defendant Dorchester County's Motion for Summary Judgment will be denied; Defendant Batson's Motion for Summary Judgment will be denied; Defendant Robinson's Motion for Summary Judgment will be denied; Plaintiffs' Conditional Motion for Leave to Amend/Correct will be granted; and Plaintiffs' Motion to Strike will be denied in part and granted in part.

I.    **BACKGROUND**

    A.    <u>The Parties</u>

Plaintiff Kleger is the surviving parent of Wyatt Allan Young ("Mr. Young"). (ECF No. 102-35 at 13-14). Plaintiff Roger Allan Young was the natural father of Mr. Young. (ECF No. 1 at 4). Defendant Dorchester County is "an entity of local government of the State of Maryland" that owns and operates the Dorchester County Detention Center ("DCDC") through its Department of Corrections ("DOC"). *Id.* at 2, 4. Defendants Batson and Robinson were correctional officers with the DCDC. (ECF Nos. 102-37 at 10, 106-36 at 9-10).

    B.    <u>Factual Background</u>
       i.    <u>*Traffic Accident, Missing Person Report, and Arrest*</u>

In January 1, 2021, Mr. Young stopped going to work and began behaving out of his usual character. (ECF No. 102-35 at 14). Plaintiff Kleger was concerned about the changes in Mr. Young's behavior to the extent that she reached out to Mr. Young's employer to ask about him. *Id.* Specifically, Plaintiff Kleger "started to think he had a drug problem." *Id.* at 17. Then on January 8, 2021, at 8:59 a.m., the Wicomico Sheriff's Office ("WSO") responded to the scene of an apparent hit and run accident. (ECF No. 102-6 at 3). The responding officer found Mr. Young's wallet, containing his driver's license, in an abandoned vehicle with front-end damage. *Id.* Dispatch provided the officer with Plaintiff Kleger's address, who was the registered owner of the

abandoned vehicle. *Id.* Thereafter, he met with Plaintiff Kleger. *Id.* According to the WSO's police report, Plaintiff Kleger "advised that she had not heard from her son since…yesterday but that she believes he…relapsed on drugs due to him missing work and disappearing for sometime [*sic*] not answering calls or responding to her messages." *Id.* She further indicated "she believe[d] Young may be suicidal due to prior statements he has made to her due to being embarrassed from relapsing on some form of drug." The officer told Plaintiff Kleger that Mr. Young "was in a very serious car accident and the car was totaled and he just missed the telephone pole and nobody could find him." (ECF No. 102-35 at 18).

After that conversation, Plaintiff Kleger filed a petition for an emergency evaluation to be performed on Mr. Young in the Wicomico County District Court because she was worried for his mental health and physical well-being. (ECF No. 102-9 at 8-9). Judge Wade of that court granted the emergency petition by way of a court order (the "Emergency Order"). *Id.* Thereafter, the Wicomico County Sheriff's office ("WCSO") issued a "Missing Person Report Form" for Mr. Young that indicated he "was involved in a hit and run," "has not been seen since the accident," and "is using CDS again and has possible made suicidal statements." *Id.* The district court held a hearing on Plaintiff Kleger's Emergency Order at 1:30 p.m. on January 9, 2021. (ECF No. 102-10). Judge Wade issued an order, finding "probable cause to believe that [Mr. Young] has shown the symptoms of a mental disorder and presents a danger to the life or safety of [himself] or others and therefore ORDERS that any peace officer take into custody and transport [him] to the nearest emergency facility for examination by a physician within six hours after arrival at the facility." (ECF No. 102-9 at 2).

After Judge Wade issued the Emergency Order, Maryland State Police informed the WSO that they located a stolen vehicle that "was just involved in a motor vehicle crash." (ECF No. 102-

6 at 6). At that time, the Maryland State Police suspected that Mr. Young was the individual operating the stolen vehicle and subsequently took him "into custody…for [a] DUI and the stolen vehicle." *Id.* at 6. Specifically, Trooper Zed Grafton arrested Mr. Young and transported him to the Maryland State Police detachment for processing, which is a separate office maintained by the Maryland State Police. (ECF No. 94-4 at 7-8). While in custody there, Maryland State Police attempted to interview Mr. Young in connection to an unrelated investigation, at which point Mr. Young invoked his *Miranda* rights. *Id.* at 12.

After the Maryland State Police received a copy of the Emergency Order by fax, the police transported Mr. Young to DCDC rather than the hospital. (ECF Nos. 94-9, 94-10). Before Mr. Young appeared before a district court commissioner by telephone, the police submitted a statement of probable cause, which contained no reference to the Emergency Order. (ECF No. 94-12). The District Court Commissioner committed Mr. Young to DCDC pending a hearing. (ECF No. 94-13). There is also no reference to the Emergency Order in the commitment document. *See id.*

ii.     *Custody at Dorchester County Detention Center*

Thereafter, Trooper Grafton transported Mr. Young to the Dorchester County Detention Center ("DCDC"). (ECF No. 102-31 at 20). Trooper Grafton's supervisors directed him "not to take [Mr. Young] to the hospital and take him straight to jail." *Id.* at 23. Mr. Young arrived at DCDC around 6:05 p.m. on January 9, 2021. (ECF Nos. 102-16 at 1, 102-18 at 2). Defendant Robinson was the shift supervisor at that time. (ECF No. 102-8 at 41). Trooper Grafton provided "a copy of all of Mr. Young's paperwork," including the Emergency Order, when he transferred Mr. Young to Defendant Robinson's custody. (ECF No. 102-31 at 20). Trooper Grafton does not recall the precise details of the conversations he had with DCDC employees that day. *See id.*

4

When asked whether he was confident that he told DCDC about the concerns that Mr. Young was suicidal, Trooper Grafton responded, "Yes, that's what I told them." *Id.* at 96. Defendant Robinson indicated he "received the paperwork" from Trooper Grafton and discussed with Trooper Grafton that Mr. Young "was in a commitment and he had drugs in his system." (ECF No. 102-36 at 19). Defendant Robinson "went through" the paperwork and indicated "everything was appropriately placed in there." *Id.* Neither Defendant Robinson nor another employee at the DCDC transported Mr. Yong to the hospital. *See id.* Rather, they brought Mr. Young to the facility and began to process him. *Id.*

Upon processing, Mr. Young tested positive for marijuana, methadone, and morphine. (ECF No. 102-4). During processing, DCDC "ask the law enforcement agency that is bringing the detainee in if there [are] any active warrants because they would have ran it at their precinct." (ECF No. 94-14 at 14). Accordingly, "any knowledge of any warrants would have come from the law enforcement agency itself." *Id.* Mr. Young was not screened as a suicide risk. (ECF No. 94-16). Then, DCDC staff placed Mr. Young in a medical cell and not on suicide watch. *See* (ECF No. 102-33 at 43-44). In a suicide watch or detox cell, there exist greater harm-prevention features like bedsheets are "fairly tearproof" such that the "design juts allows you not to tie knots" to prevent a person from harming himself. (ECF No. 102-8 at 59-60). Further, individuals would wear a tearproof smock rather than regular clothing. *Id.* at 59. Suicide watch and detox cells also require officers to conduct fifteen-minute in-person checks and requires live-feed camera streaming monitored by officers in the control center. (ECF Nos. 102-8 at 32, 70; 102-20). Such measures are not present in standard cells for processing and in medical cells. (ECF No. 102-8 at 21-23). Further, medical cells require thirty-minute security checks as opposed to fifteen-minute checks. *Id.*

According to Officer Arthur Nelson, when an officer transfers an individual and either has an Emergency Order or indicates that one exists, DCDC officers have a "responsibility" to "turn them away so they could take them to the hospital for their evaluation because…that's a legal court document [by] which they have to abide…" *Id.* at 28. If the DCDC officers relied on "word of mouth," they would "make a telephone call to the chief of security" to obtain the Emergency Order record. *Id.* at 30. If the individual were to remain in DCDC custody, "it would come from a higher authority than the shift supervisor has at that point." *Id.* Moreover, corrections officers do not require medical sign-off permissions to place an individual on suicide watch, as it is considered a "security measure." *Id.* at 118. If an individual is placed in a non-suicide watch cell, the individual must be moved to a detox cell "without hesitation" if "a family member calls in" with a report that the individual is suicidal. *Id.* at 26.

At some point after Mr. Young was processed for placement in the medical cell, the 7:00 a.m. to 7:00 p.m. corrections officer shift changed, and officers working the 7:00 p.m. shift to 7:00 a.m. shift took command.  (ECF No. 104-3). During that shift change, Corrections Officer Nelson replaced Defendant Robinson as the Shift Supervisor.  (ECF No. 102-11 at 1). During the changeover, Defendant Robinson did not tell Corrections Officer Nelson about the Emergency Order or that Mr. Young was suicidal.  (ECF No. 102-8 at 46).

### iii.     *Plaintiff Kleger's Call to DCDC*

Plaintiff Kleger learned that Mr. Young was transported to DCDC from one of Mr. Young's friends.  (ECF No. 102-36 at 39). Thereafter, she called DCDC's main phone number at 8:27 a.m. on January 10, 2021.  (ECF No. 102-23 at 2; 102-36 at 40). That phone call lasted approximately seven minutes.  (ECF No. 102-23 at 2). Plaintiff Kleger's husband recalls hearing Plaintiff Kleger "pleading her case that there was an EP in place, [Mr. Young] should be put in

some sort of suicide watch or where he should have gotten help that he needed.[3]" (ECF No. 102-34 at 16-17). During that phone call, Corrections Officer Jazmyne Sampson was assigned to the control center and was responsible for answering phones. (ECF No. 102-26 at 13, 17). Though C.O. Sampson did not recall this specific phone call, she indicated she would have responded to the report that Mr. Young was suicidal by "transfer[ing] it to [her] immediate supervisor immediately." *Id.* at 22. At that time, C.O. Sampson's immediate supervisor was Defendant Batson. *Id.* at 25. She indicated she did not have the authority to place an inmate on suicide watch and that "Sergeant Davion Batson who would have been who [she] transferred [her] call to." *Id.* According to Plaintiff Kleger, she "told them that he has an EP. I said this so many times. He has an EP. It's an emergency evaluation and you have to take him to the hospital." (ECF No. 102-35 at 40). At that time, Plaintiff Kleger spoke with a woman who told her to call back the following Monday. *Id.* Then, the operator transferred the call to a man after Plaintiff Kleger said multiple times, "he's suicidal, he's suicidal, you have to take him to the hospital." *Id.* She indicated that in total, she called five times that day. *Id.* at 49.

### iv.     *Mr. Young's Suicide in DCDC Custody*

On January 10, 2021, around 10:05 a.m., Mr. Young was seen alive in his medical cell. (ECF No. 102-16 at 1-2). While conducting rounds, Defendant Robinson and a nurse witnessed Mr. Young "laying on his bed with his eyes open." *Id.* Defendant Robinson again conducted a

---

[3] Of some concern is the spoliation doctrine. (ECF No. 104 at 17 n.4). Plaintiffs indicate they sent a preservation letter to DCDC. (ECF No. 104-24). Indeed, the preservation letter seeks "preservation of all evidence relating to this incident" including "telephone logs." *Id.* According to DCDC personnel, all call logs are stored for eighteen to twenty-four months, meaning the letter was sent greater than a year before any call logs pertaining to the incident would have been routinely deleted. (ECF No. 25 at 8). DCDC failed to preserve the telephone records, including those relating to Plaintiff Kleger's conversation with Officer Sampson. (ECF No. 27). At this juncture, the Court declines to make a ruling on spoliation, as it is not a central issue to summary judgment. However, Plaintiffs may request a jury instruction for the Court's consideration should it become necessary.

"tier check" around 10:40 a.m.[4]  According to the surveillance footage, Defendant Robinson observed Mr. Young's cell for approximately ten seconds before leaving the medical tier approximately a minute and a half later. (ECF No. 98-1 at 11:40:07-11:41:40). During that check, Mr. Young was behind the door near the corner of the cell.  (ECF No. 102-17 at 4).

The next check occurred about thirty minutes later, when Defendant Robinson returned to the medical tier with the afternoon meals.  (ECF No. 102-3 at 2). At that time, Defendant Robinson observed Mr. Young hanging by the door hinge near the corner of his cell.  (ECF No. 102-16 at 1).  Mr. Young "had tied a piece of sheet around his neck" in such a manner that was "tied…[to] obstruct his airway."  *Id.*  Defendants called 911 around 11:45 a.m., and he was pronounced deceased around 12:00 p.m. on January 10, 2021.  (ECF Nos. 102-2 at 2; 102-18 at 2).

Afterwards, an inmate named Gregory Oeschner submitted a written statement to the Dorchester County Sheriff's Department.  (ECF No. 102-14). Mr. Oechsner was housed in the cell directly across from Mr. Young's cell and was able to see into it.  (ECF No. 102-3 at 2). In his statement, Mr. Oechsner indicated that Mr. Young "was at his window with a noose in his hand for about 5-10 minutes."  (ECF No. 102-14). Mr. Young's autopsy report concluded that Mr. Young died due to "asphyxia by hanging." (ECF No. 102-12 at 1, 5).

    C.    <u>Relevant Procedural Background</u>

The record is well-developed.  Plaintiff filed the instant case on January 10, 2024.  (ECF No. 1). Defendant Dorchester County filed a motion to dismiss for failure to state a claim on April 24, 2025.  (ECF No. 30). Defendant Batson filed a motion to dismiss for failure to state a claim, or in the alternative, for summary judgment on May 14, 2024.  (ECF No. 40). Thereafter, the Court

---

[4] The parties have noted a discrepancy between the contemporaneous written documentation regarding this time check and the time stamp on surveillance footage. (ECF Nos. 94-28 at 7 n.1, 102 at 19 n.6). The Parties agree that the surveillance footage timestamp is incorrect and that the tier check occurred at 10:40 a.m.

granted in part and denied in part the motion to dismiss. (ECF No. 70). Defendants answered on August 22, 2024, August 26, 2024, and August 29, 2024. (ECF Nos. 75, 76, 80). After discovery, Defendants filed the presently pending motions for summary judgment on August 12, 2025. (ECF Nos. 94, 96, 97). Thereafter, on October 31, 2025, Plaintiff filed a Conditional Motion for Leave to Amend the Complaint based on several of Defendant Robinson's summary judgment arguments. (ECF No. 120). Plaintiff also filed a Motion to Strike Defendant Robinson's Reply in Support of Summary Judgment (ECF No. 119), or in the Alternative, for Limited Discovery and a Sur-Reply. (ECF No. 121). After thorough review, the Court will address each of the pending motions at this juncture.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) requires the Court to "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A dispute as to a material fact "is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *J.E. Dunn Const. Co. v. S.R.P. Dev. Ltd. P'ship*, 115 F. Supp. 3d 593, 600 (D. Md. 2015) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A nonmoving party "opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting Fed. R. Civ. P. 56(e)).

The Court is "required to view the facts and draw reasonable inferences in the light most favorable to" the nonmoving party. *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008) (citing *Scott v. Harris*, 550 U.S. 372, 377 (2007)). However, the Court must also "abide by the 'affirmative

obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial.'" *Heckman v. Ryder Truck Rental, Inc.*, 962 F. Supp. 2d 792, 799–800 (D. Md. 2013) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993)).  Consequently, a party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences. *See Deans v. CSX Transp., Inc.*, 152 F.3d 326, 330–31 (4th Cir. 1998). "[I]n the face of conflicting evidence, such as competing affidavits, summary judgment ordinarily is not appropriate, because it is the function of the fact-finder to resolve factual disputes, including matters of witness credibility." *Angelini v. Balt. Police Dep't*, 464 F. Supp. 3d 756, 776 (D. Md. 2020).

## III.    ANALYSIS

### A.    There Exist Genuine Issues of Material Fact Underlying Defendant Batson's Knowledge of Mr. Young's Suicidal Ideation and Therefore He is Not Entitled to Public Official Immunity.

Defendant Batson again seeks public official immunity based on the argument that his actions were within the scope of his employment and without gross negligence, as a matter of law. (ECF No. 94-28 at 8).  As stated at the motion to dismiss stage, "public official immunity is recognized both at common law and by statute." *Balt. Police Dep't v. Cherkes*, 140 Md. App. 282, 328 (2001).  Under Md. Code Ann., Cts. & Jud. Proc. § 5-507, "[a]n official of a municipal corporation, while acting in a discretionary capacity, without malice, and within the scope of the official's employment or authority shall be immune as an official or individual from any civil liability for the performance of the action."  *Id.* § 5-507(a)(1).  The doctrine aims to "permit [public] officers . . . to make the appropriate decisions in an atmosphere of great uncertainty" because "holding [public] officers liable in hindsight for every injurious consequence would paralyze the functions of law enforcement."  *Cherkes*, 140 Md. App. at 328.  For common law public official immunity to apply:

> (1) the actor must be a public official, rather than a mere government employee or agent; (2) the conduct must have occurred while the actor was performing discretionary, as opposed to ministerial acts; and (3) the actor must have performed the relevant acts within the scope of his official duties.

*City of District Heights v. Denny*, 123 Md. App. 508, 516 (1998).

"If those three conditions are met, the public official enjoys a qualified immunity in the absence of 'malice. [5]'" *Id.* Maryland's highest court then expanded this "exception" to public official immunity to include "gross negligence" in *Cooper v. Rodriguez*, 443 Md. 680, 723–24 (2015). *Cooper* defined "gross negligence" as follows:

> [A]n intentional failure to perform a manifest duty in reckless disregard of the consequences as affecting the life or property of another, and also implies a thoughtless disregard of the consequences without the exertion of any effort to avoid them. Stated conversely, a wrongdoer is guilty of gross negligence or acts wantonly and willfully only when he [or she] inflicts injury intentionally or is so utterly indifferent to the rights of others that he [or she] acts as if such rights did not exist.

*Id.* at 708. "Whether or not gross negligence exists necessarily depends on the facts and circumstances in each case[,] and is usually a question for the jury and is a question of law only when reasonable [people] could not differ as to the rational conclusion to be reached." *Id.* at 708–09 (citing *Romanesk v. Rose*, 248 Md. 420, 423 (1968)).

Little has changed since the motion to dismiss stage. Defendants place great emphasis on the discovery revelation that Defendant Robinson conducted the 30-minute wellness checks as required. (ECF No. 94-28). However, this is not the only basis upon which the Complaint and the other evidence support an allegation of gross negligence. Discovery also shows Plaintiff Kleger called DCDC on the morning of January 10, 2021 and spoke with an employee for approximately seven minutes. (ECF No. 102-23 at 2). During that phone call, Plaintiff Kleger was "Kleger "pleading her case that there was an EP in place, [Mr. Young] should be put in some sort of suicide

---

[5] The Court disposed of the actual malice issue at the motion to dismiss stage. *See generally* (ECF No. 69).

watch or where he should have gotten help that he needed." (ECF No. 102-34 at 16-17). C.O. Sampson, the officer assigned to answer the phones, indicated she would have responded to such information by transferring the phone call to her immediate supervisor. (ECF No. 102-26 at 13, 17). Plaintiff Kleger recalled speaking with a man, and she also told that individual, "he's suicidal, he's suicidal, you have to take him to the hospital." (ECF No. 102-35 at 40). To that end, there exists a factual dispute as to whether that employee was Defendant Batson or another employee in a supervisory capacity.[6] Thus, there exists a genuine dispute of material fact regarding Defendant Batson's knowledge of Mr. Young's suicidal ideation. Based on Plaintiff Kleger's, her husband's, and C.O. Sampson's testimony, a reasonable jury could conclude that Defendant Batson knew Mr. Young was a suicide risk and ignored Plaintiff Kleger's indications about Mr. Young's emergency order. It could be true that a jury is unpersuaded and finds in favor of Defendants. But affording all inferences in the light most favorable to Plaintiffs, there exists, at the very least, a genuine issue of material fact with respect to gross negligence.[7] Indeed, Defendant Batson's concern with certain credibility issues are not for the Court to resolve at summary judgment. *Angelini*, 464 F. Supp. 3d at 776. Therefore, Defendant Batson's Motion to Dismiss (ECF No. 94) is DENIED.

**B.    Defendant Robinson's Motion for Summary Judgment is Denied Because the Record Contains Multiple Genuine Issues of Material Fact Concerning Defendant Robinson's Knowledge that Mr. Young Presented a Risk of Suicide.**

1.    <u>There Exist Genuine Issues of Material Fact Regarding Defendant Robinson's Knowledge that Mr. Young Posed a Suicide Threat.</u>

---

[6] *See supra* Section III.A.

[7] There exists some additional dispute as to whether DCDC's policies conferred upon Defendant Batson a ministerial or discretionary duty to place Mr. Wyatt in a suicide risk cell. (ECF Nos. 102 at 26, 118 at 6). However, because there exists a genuine fact dispute as to whether Defendant Batson had knowledge of Mr. Young's suicidal ideation, the Court declines to make a determination on this issue.

Defendant Robinson first seeks summary judgment under Count I because, as he contends, "Defendant Robinson had zero awareness that Mr. Young presented a risk of suicide until he was unresponsive in his cell…" (ECF No. 97-1 at 24). But a defendant's subjective knowledge is no longer the only path to establishing liability. The jurisprudence reflecting this expansion is extensive. *E.g.*, *Farmer v. Brennan*, 511 U.S. 825 (1994); *Kingsley v. Hendrickson*, 576 U.S. 389 (2015); *Thompson v. Virginia*, 878 F.3d 89, 97–98 (4th Cir. 2017); *Short v. Hartman*, 87 F.4th 593, 611 (4th Cir. 2023). Indeed, "[a] pretrial detainee's Fourteenth Amendment failure to protect claim" was previously "analyzed under the two-pronged inquiry set forth in *Farmer v. Brennan*, 511 U.S. 825 (1994)." *State v. Wallace*, Nos. 0164 & 0642, September Term, 2021, 2022 WL 2282705, at *17 (Md. Ct. Spec. App. June 23, 2022), *cert. granted*, 482 Md. 142 (2022), and *case dismissed*, 483 Md. 262 (2023). Under *Farmer*, the analysis required a plaintiff prove (1) objectively, "the prisoner must be exposed to a substantial risk of serious harm"; and (2) subjectively, "the prison official must know and disregard that substantial risk to the inmate's health or safety." *Thompson*, 878 F.3d at 97–98. Thereafter, *Kingsley v. Henderson* eliminated the subjective requirement to prove a Fourteenth Amendment violation under a theory of failure to protect a pretrial detainee. *See Kingsley*, 576 U.S. at 397. *Short* again clarified that the case law "repudiates a subjective requirement for pretrial detainees' Fourteenth Amendment claims and permits pretrial detainees to state Fourteenth Amendment claims . . . on the purely objective basis that the governmental action they challenge is not rationally related to a legitimate nonpunitive governmental purpose or is excessive in relation to that purpose." *Short*, 87 F.4th at 611. Under the present objective test,

> [t]he plaintiff no longer has to show that the defendant had actual knowledge of the detainee's serious medical condition and consciously disregarded the risk that their action or failure to act would result in harm. That showing remains sufficient, but it is no longer necessary. Now, it is sufficient that the plaintiff show that the

defendant's action or inaction was, in *Kingsley*'s words, 'objectively unreasonable,' that is, the plaintiff must show that the defendant should have known of that condition and that risk, and acted accordingly.

*Id.* (quoting *Kingsley*, 576 U.S. at 397).

Alternatively, a pretrial detainee plaintiff may prevail under the Fourteenth Amendment "if they can meet the more demanding Eighth Amendment standard." *Id.* at 612. Under this standard, a plaintiff may prevail under a deliberate indifference test, which includes both of the objective and subjective components previously applied during the *Farmer* era. *Id.* at 608, 612. ("The Supreme Court's ruling in *Kingsley v. Hendrickson* upends the assumption that Fourteenth Amendment Due Process claims should be treated the same as Eighth Amendment claims . . . Though the Supreme Court instructed in *Kingsley* that an objective test is proper for pretrial detainees' claims under the Fourteenth Amendment, a pretrial detainee can still state a claim if they can meet the more demanding Eighth Amendment standard."). As stated at the motion to dismiss stage, "[t]he subjective element requires that the prison official acted with deliberate indifference to inmate human health or safety, meaning that the official 'had actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by the official's action or inaction.'" *Id.* (quoting *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014)).

Thus, at this juncture, the Court is satisfied that summary judgment depends in large part on whether there exists a genuine issue of material fact regarding Defendant Robinson's knowledge that Mr. Young was suicidal. *See id.* As stated above, the Court does not find that the revelation of Defendant Robinson's timely checks defeats all genuine issues of material fact underlying knowledge. A reasonable jury could believe either of Plaintiffs' theories underlying knowledge; if a jury were to believe that Trooper Grafton included a copy of the Emergency Order in the paperwork he provided Defendant Robinson, a jury could very well find that Defendant

Robinson knew or should have known of Mr. Young's suicidal ideation. Similarly, were a jury to believe that Trooper Grafton told Defendant Robinson that Mr. Young was suicidal, an inference of knowledge could reasonably follow.  Defendant Robinson's emphasis on inferences in his favor are unavailing. (ECF No. 97-1 at 17). While it is possible a jury could agree that Defendant Robinson's mere presence at the Sallyport with Trooper Grafton does not necessitate an inference that he knew or should have known that Mr. Young was suicidal, that possibility is not dispositive. Defendant Robinson's emphasis on the Incident Report (ECF No. 97-15) and his own testimony (ECF Nos. 97-13, 97-20); is well taken but is similarly non-dispositive.  To grant summary judgment based on these arguments would require the Court to disregard the reasonable inferences that can be drawn from Trooper Grafton's testimony[8] in favor of those that can be drawn from Defendant Robinson's.  While a jury could very well do so, the Court cannot.  *Angelini*, 464 F. Supp. 3d at 776.  Moreover, it cannot be said that Trooper Grafton's testimony constitutes only a scintilla of evidence.  *Peters v. Jenney*, 327 F.3d 307, 314 (4th Cir. 2003) (citing *Anderson*, 477 U.S. at 252).  At the very least, it is clear that there exists some fact dispute as to Defendant Robinson's subjective knowledge that Mr. Young was suicidal.  *Short*, 87 F.4th at 611-12. It then follows that are also genuine issues of material fact with respect to deliberate indifference considering the parties disputes over (1) the quality of the checks; (2) the responsibilities under

---

[8]

      …is it fair to say that you are confident that you verbally told the detention center about the concerns that this man may be suicidal and the emergency protection order? [objections omitted]

      A.   Yes, that's what I told them.

(ECF No. 102-31 at 96).

Trooper Grafton also provided "a copy of all of Mr. Young's paperwork," including the Emergency Order, when he transferred Mr. Young to Defendant Robinson's custody.  (ECF No. 102-31 at 20). Defendant Robinson indicated he "received the paperwork" from Trooper Grafton and discussed with Trooper Grafton that Mr. Young "was in a commitment and he had drugs in his system."  (ECF No. 102-36 at 19).

the DCDC policies; (3) why Mr. Young was not transported to the hospital; and (4) what was communicated to CO Nelson during the supervisory shift change. (ECF No. 106 at 22). Finally, the Court is not persuaded that the issue of harm has been removed from trial after reviewing the record before it. Contrary to Defendant Robinson's argument that there can be no causation because he performed a cell check 30 minutes before discovering Mr. Young's suicide, the foregoing analysis demonstrates several factual disputes that also relate to whether Defendant Robinson's conduct caused Mr. Young harm. Therefore, Defendant Robinson's motion for summary judgment with respect to Count I is DENIED.[9]

2.    Defendant Robinson is Not Entitled to Qualified Immunity or Public Official Immunity.

Defendant Robinson also argues he is entitled to qualified immunity under Count I and public official immunity under the remaining common law tort claims. (ECF No. 97-1 at 25, 27). Defendant Robinson correctly states that qualified immunity protects government officials from civil liability "unless the official's conduct violated a clearly established constitutional right." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). Based on the Court's analysis regarding the existing genuine issues of material fact underlying Defendant Robinson's knowledge, the Court declines to find that Defendant Robinson is entitled to qualified immunity under Count I. Similarly, and consistent with the Court's reasoning as to Defendant Batson's public official immunity, the Court declines to grant summary judgment on this basis in light of the fact disputes concerning

---

[9] Plaintiff correctly points out that Maryland's Constitutional requirements are more demanding of its municipalities than the United States Constitution. *Prince George's County v. Longtin*, 419 Md. 450, 492-93 (2011). Thus, Defendant Robinson's motion for summary judgment with respect to Count II is also denied.

knowledge.[10]   Therefore, Defendant Robinson's motion for summary judgment on the issue of immunity is denied.

> **C.**    **Defendant Dorchester County is an Active Defendant Under Count II Based on a Theory of Respondeat Superior and There Exist Genuine Issues of Material Fact Regarding DCDC Employee Knowledge that Mr. Young Presented a Suicide Risk and the Constitutionality of Their Responses to Such Knowledge.**

Defendant Dorchester County argues its "liability is solely derivative of the claims against the individual Defendants and under State law only." (ECF No. 96-1 at 1). Accordingly, it asserts the "County is a purported 'indemnor' with respect to the common law tort claims, and is an 'active Defendant' only in the state constitutional claim under Article 24." *Id.* That much is not disputed. Nevertheless, Defendant Dorchester County seeks summary judgment based on the arguments set forth in Defendant Robinson's and Defendant Batson's motions for summary judgment, ultimately contending if neither individual defendant can be held liable, the claims against Dorchester County must be dismissed.  *Id.* Plaintiffs argue there exists an independent basis upon which a jury may hold Defendant Dorchester County liable for the wrongs of any employees, named or unnamed in this case, who acted within the scope of their employment based on a theory of *respondeat superior*. (ECF No. 104 at 20).   In its reply, Defendant Dorchester County argues "both the Maryland Supreme Court and this Court have made clear that for a local government to be liable under a theory of *respondeat superior*, there must be a predicate finding of liability on behalf of an individual defendant." (ECF No. 116 at 1-2) (citing *DiPino v. Davis*, 354 Md. 18, 48 (1999)). Defendant Dorchester County emphasizes that at the motion to dismiss stage, this Court "has

---

[10] Given that there is an embedded question of gross negligence considered under the public official immunity inquiry, it follows that granting summary judgment on the issue of gross negligence is also inappropriate.  *See supra* Section III.A.

already ruled, pursuant to well-established Maryland law, that the County's liability may only be predicated on a finding of liability by an individual defendant here." (ECF No. 116 at 1).

Contrary to Defendant Dorchester County's characterization of the holding at the motion to dismiss stage, the Court did not rule that "the County's liability may *only* be predicated on a finding of liability by an individual defendant here." (ECF No. 116) (emphasis added). In support of this characterization, Defendant cites to the entirety of the Court's motion to dismiss analysis concerning Dorchester County rather than a specific proposition to that effect. To be sure, the Court dismissed Counts I and III through VII on the basis that (1) there exists no vicarious liability under 42 U.S.C. § 1983 and (2) Defendant Dorchester County is immune from suit under Counts III through VII. (ECF No. 69 at 10-13; ECF No. 70). However, the Court did not dismiss Count II against Defendant Dorchester County. *See id.* Nor did the Court conclude that Plaintiffs' state constitutional claims depend on a finding of Defendant Robinson's or Defendant Batson's liability. *Id.* Rather, the Court noted that that the Plaintiffs conflated "Dorchester County's duty to defend and indemnify its employees in a tort suit with a waiver of governmental immunity" with respect to Counts III through VII, the common law tort claims. *Id.* at 13. Thus, the Court dismissed the common law tort claims—not the state constitutional claims—reasoning that there may exist indemnification liability down the line on Counts III through VII, if Defendants Batson and Robinson are liable on the common law tort claims. *See id.* at 12-13 (citing *Rodwell v. Wicomico Cnty., Maryland*, No. CV DKC 22-3014, 2024 WL 1178202, at *9 (D. Md. Mar. 19, 2024)). That considered, the motion to dismiss left a door open to summary judgment arguments regarding the constitutional claims set forth under Count II. *See* (ECF No. 69 at 10-13). Under Count II, which the Court did not dismiss, Plaintiff seeks recovery under Articles 16, 19, 24, 25, and 26 of the

Maryland Declaration of Rights.[11]    Based on the Court's review of the summary judgment memoranda (ECF Nos. 96, 204, 116), the operative disputes are (1) whether Defendant Dorchester County is an active defendant under the state constitutional claims and (2) whether Defendant Dorchester County's potential *respondeat superior* liability under state constitutional claims may be predicated on the conduct of employees not named in the case.  *See* (ECF Nos. 96-1, 104, 116).

      1.   <u>Maryland Law Clearly Distinguishes *Respondeat Superior* Liability in Common Law Tort Claims and State Constitutional Claims.</u>

Both parties point to *DiPino v. Davis* in support of their respective positions on this issue. (ECF Nos. 96-1 at 1, 104 at 23, 116 at 2) (citing *DiPino v. Davis*, 354 Md. 18, 47-48 (1999)). There, the court considered claims arising under Articles 21, 24, 25, 26, and 40 of the Declaration of Rights. *DiPino*, 354 Md. at 50 n.7.  Defendant Dorchester County relies on the court's common law tort analysis in support of its position a "local government's liability for a state constitutional violation is purely derivative" and "an individual employee must first be found liable for the entity to be liable" (ECF No. 116 at 2) (citing *DiPino*, 354 Md. at 48 (analyzing state common law and not constitutional torts)). No such statement appears in *DiPino*.  *DiPino*, 354 Md. at 48.  To that extent, Defendant Dorchester County inserts language favorable to its position where none exists. With respect to the constitutional tort claims, the *DiPino* court recognized that "neither the local government nor a local governmental entity has available any governmental immunity in an action based on rights protected by the State Constitution." *Id.* at 50. (citing *Clea v. Mayor & City Council of Balt.*, 312 Md. 662, 672–73 (1988), *superseded by statute*, Md.Code (1984, 2004 Repl.Vol.), §

---

[11] To begin, "Article 24 is construed *in pari materia* with the Fourteenth Amendment, Article 26 is construed *in pari materia* with the Fourth Amendment, and Articles 16 and 25 are construed *in pari materia* with the Eighth Amendment."  *Id.*; *see also Telep v. Stickney*, No. 1:23-CV-02379-JMC, 2024 WL 2114761, at *9 (D. Md. May 10, 2024) (collecting cases for the proposition that claims under the Maryland Declaration of Rights are analyzed *in pari materia* with federal constitutional claims).  Defendant Dorchester County concedes that it is an active defendant with respect to Article 24. (ECF No. 96).  However, it still seeks summary judgment based on Defendant Robinson's and Defendant Batson's summary judgment motions.  *Id.*

12–101(a) of the State Government Article, *as recognized in Houghton v. Forrest*, 412 Md. 578, 588–89 (2010)). Likewise, the court noted, "[a]lthough we have consistently applied *respondeat superior* liability to local governmental entities for Constitutional violations committed by their officials, we have never actually articulated the doctrine in that context." *Id.* Plaintiffs correctly point to the court's conclusion on this issue: "We shall now dispel any doubt in the matter and make clear, as a matter of common law, that local governmental entities do, indeed, have *respondeat superior* liability for civil damages resulting from State Constitutional violations…" *Id.*; *see also Albero v. Worchester Cnty. Bd. of Commr's*, Civil No.: JKB-24-1100, 2025 WL 462588, at *10 (D. Md. Feb. 11, 2025) (dismissing only two state constitutional claims against a defendant county when the plaintiff sought to hold the county liable for their conduct under a theory of *respondeat superior*); *Palmer v. Maryland*, Civil No. 1:22-0899-CDA, 2024 WL 4349730, at *6 (D. Md. Sept. 30, 2024) ("Maryland law has a broader reach and 'imposes respondeat superior liability on municipalities for [] State constitutional violations of its employees,' while Monell claims do not.") (citations omitted); *McMahon v. Cnty. Comm'rs of Kent Cnty.*, No. CIV. JFM-13-490, 2013 WL 2285378, at *5 (D. Md. May 21, 2013) ("Maryland, unlike the United States, [ ] imposes respondeat superior liability on local government entities for civil damages resulting from State [c]onstitutional violations committed by their agents and employees within the scope of the employment."). Thus, to the extent that the County seeks summary judgment for claims predicated on the individual defendants' conduct, Defendant's Motion is denied based on the analysis above. *See supra* Sections III.A-III.B.

> 2. Plaintiffs' State Constitutional Claims against Defendant Dorchester County Raise Genuine Issues of Material Fact Under a Theory of *Respondeat Superior*.

Of greater focus on the parties' arguments is Defendant Dorchester County's argument that its *respondeat superior* liability must stem from the wrongful conduct of a named defendant, as Defendant repeatedly insists that any liability is predicated on Defendant Robinson's and Defendant Batson's conduct.  (ECF No. 116 at 2) (citing *Albero*, 2025 WL 462588, at *10). However, Defendant's case law is unavailing.  In *Albero*, this Court dismissed two particular *respondeat superior* claims against a county when the plaintiff failed to state a claim for the two state constitutional claims against the claims' corresponding two county officials. *Albero*, 2025 WL 462588, at *10.  Indeed, this Court noted "Plaintiffs fail to state an Article 24 claim against either [county official] directly…And without an underlying Article 24 violation by an individual, there can be no corresponding *respondeat superior* liability on the part of a municipality." *Id.* However, the *Albero* Court did not dismiss the remaining *respondeat superior* claims against the county because the Court did not consider the conduct of the remaining individuals at that juncture. *Id.* ("And because *respondeat superior* liability turns on a finding of unlawful conduct by an individual who reports to a superior person or entity…it would be inappropriate to dismiss the respondeat superior claim in full before considering the Article 24 claims against all individual [d]efendants."). Thus, contrary to the County's assertions, it cannot be said that *Albero* supports the proposition that a defendant county is liable under a theory of *respondeat superior* only for the conduct of other named defendants.  *See id.*  Rather, the claims were dismissed insofar as they were attributed to the conduct of two particular officials and the complaint failed to state a claim against them. *See id.*

Defendant also points to *Willey v. Board of Education of St. Mary's County*, which states "the *respondeat superior* theory of liability rests upon a plaintiff sufficiently alleging a tort or state constitutional violation by *an* employee."  *Willey v. Bd. of Educ. of St. Mary's Cnty.*, 557 F.Supp.3d

645, 671 (D. Md. 2021) (emphasis added). There, the Court dismissed without prejudice and with leave to amend a *respondeat superior* claim because the plaintiffs did not sufficiently allege a state constitutional violation by an employee. *Id.* *Willey* did not require that any such employee be named in the case. *See id.* Thus, *Willey*, much like *Albero*, does not support the proposition that an individual defendant must be named in order to impose *respondeat superior* liability upon an entity. *See id.*; *Albero*, 2025 WL 462588, at *10.

Indeed, "[u]nder the doctrine of *respondeat superior*, an employer is jointly and severally liable for the torts committed by an employee acting within the scope of his employment." *Jordan v. Western Distributing Co.*, 286 F. Supp.2 d 545, 548 (D. Md. 2003) (quoting *Baltimore Police Dep't v. Cherkes*, 140 Md.App. 282 (2001)); *see also Holland v. Prince George's County, Md.*, Civil Action No. DKC 09–2737, 2011 WL 530559, at *7-*8 (D. Md. Feb. 8, 2011) (denying a defendant's motion for summary judgment under Article 24 based on a theory of *respondeat superior* against a defendant county when also granting summary judgment with respect to two unnamed individual guards, thereby leaving the county as the only defendant in the case). Based on the analysis above, the Court cannot conclude that Plaintiffs' state constitutional claims are attributed solely on the conduct of Defendants Robinson and Batson. Thus, like at the motion to dismiss stage, the Court declines to grant summary judgment under Count II.[12] Moreover, even if the Court were to accept Defendant's position that any *respondeat superior* liability must be attributable to the individual defendants, the Court has already determined there exist multiple fact disputes regarding Defendant Batson's and Defendant Robinson's liability. Thus, the *respondeat*

---

[12] Plaintiff emphasizes that there is some basis upon which a jury could find that an employee other than Defendant Robinson or Defendant Batson acted within the scope of employment and engaged in a state constitutional violation, which will be analyzed in greater detail above. (ECF No. 104). To that end there exists, at the very least, a factual dispute only a jury can resolve.

*superior* claims based on their conduct are necessarily denied.  Therefore, Defendant Dorchester County's Motion for Summary Judgment (ECF No. 96) is DENIED.

>    **D.    Plaintiffs' Conditional Motion for Leave to Amend the Complaint is Granted Because the Court is Satisfied that the Amendment Relates Back to the Complaint and Does Not Present Unfair Prejudice.**

After the parties submitted their summary judgment memoranda, Plaintiffs filed a Conditional Motion for Leave to Amend, seeking an amendment to the Complaint by interlineation were the Court to be persuaded that Defendants are entitled to summary judgment based on the revelation that Defendant Robinson did conduct thirty-minute cell checks. (ECF No. 120) (citing Fed. R. Civ. P. 15(a)(2)).  Courts freely grant leave to amend the complaint when justice requires. Fed. R. Civ. P. 15(a)(2); *see also Forman v. Davis*, 371 U.S. 187, 182 (1962).  Indeed, Courts freely allow amendment of the pleadings so long as there exists no prejudice, undue delay, bad faith, or futility.  *Forman*, 371 U.S. at 182.  Whether an amendment is prejudicial "will often be determined by the nature of the amendment and its timing."  *Laber v. Harvey,* 438 F.3d 404, 427 (4th Cir. 2006).

While the Court does not find that the discovery revelation of timely tier checks defeats all genuine issues of material fact underlying Defendant Robinson's knowledge, the Court recognizes that the Complaint does rest on allegations the parties agree to be false.  (ECF Nos. 1, 119, 120). After thorough review, the Court is satisfied that the allegations set forth in the Complaint fairly theorize wrongful conduct such that an amendment by interlineation would not pose any unfair prejudice.  (ECF No. 1 at 16) ("Defendants acted with deliberate indifference and/or unreasonableness to Mr. Young's established rights…when they failed to assign adequate protection for him in the first place upon entry to DCDC").).  Although discovery has concluded, Plaintiffs seek an amendment that would clarify the Complaint's allegations to incorporate the

"new" fact that Defendant Robinson performed 30-minute checks. Of course, the Complaint presently includes an allegation to the contrary. *Id.* As explored above, even if such checks were timely performed, discovery exposed fact disputes as to the *quality* of Defendant Robinson's tier checks and adequacy Defendant Robinson's response to the sallyport conversation in which he may or may not have learned that Mr. Young presented a suicide risk. *See supra* Section III.B. Moreover, the Court trusts Plaintiff's assertion that she alleged the facts she believed to be true at the time of filing. (ECF No. 120 at 22). Although the Complaint does allege that certain abuses resulted from failure to conduct thirty-minute tier checks, there are enough clear allegations of wrongdoing in other instances such that the Court cannot conceive of any prejudice that might result from an amendment. Therefore, Plaintiffs' Conditional Motion for Leave to Amend the Complaint is granted to the extent it is necessary to clarify the allegations against Defendant Robinson.

### E. Plaintiffs' Motion to Strike is Denied, but Plaintiffs Are Entitled to Limited Discovery Should Either Mr. Aaron or Mr. Bolden Intend to Testify.

The Court has greater concern for the issues raised in Plaintiffs' second post-summary judgment motion, the Motion to Strike. (ECF No. 121). Plaintiffs ask this Court to strike Mr. Bolden's and Mr. Aaron's affidavits (ECF Nos. 97-14, 119-1). (ECF No. 121). Alternatively, Plaintiffs ask for limited discovery such that Plaintiffs may depose them. *Id.* Plaintiffs also assert a sur-reply is appropriate because Mr. Bolden's affidavit raises new arguments. *Id.* Plaintiffs urge the Court to strike the affidavits, in part due to their assertion that neither Mr. Bolden nor Mr. Aaron has personal knowledge of the matters to which they have testified and that the contents are not relevant. (ECF No. 121).

As an initial matter, the Court is not persuaded to strike Mr. Bolden's and Mr. Aaron's affidavits based on Plaintiffs' evidentiary concerns. Of course, "[t]he court and the parties have

great flexibility with regard to the evidence that may be used on a [summary judgment] proceeding." *Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*, 790 F.3d 532, 538 (4th Cir. 2015) (quoting 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2721 (3d ed. 1998)). "The court may consider materials that would themselves be admissible at trial, and the content or substance of otherwise inadmissible materials where 'the party submitting the evidence show[s] that it will be possible to put the information ... into an admissible form.'" *Id.* (quoting 11 James W. Moore et al., Moore's Federal Practice § 56.91[2] (3d ed. 2015)). Put simply, the operative question is whether the information submitted has a pathway to admissibility, not whether it is admissible in its current form. At the very least, the affidavits present testimony regarding Mr. Aaron's and Mr. Bolden's knowledge of DCDC procedure, what they recall of their interactions with DCDC personnel and Trooper Grafton, and the usual practices of prisoner transport. (ECF Nos. 97-14, 119-1). While each particular statement within each affidavit and the affidavits themselves may not be admissible, the Court declines to disregard them at the summary judgment posture. *Humphreys*, 790 F.3d at 538. Moreover, considering that the Court denies Defendants' summary judgment motions, a sur-reply is unnecessary. Thus, the Court declines to strike the affidavits and authorize a sur-reply. To that extent, the Motion to Strike (ECF No. 212) is DENIED in part.

The Court does, however, find it pertinent to address the issue of disclosure and the extent to which Defendant Robinson complied with Plaintiffs' interrogatory requests. Plaintiffs characterize the relevant discovery events as follows:

> On January 17, 2025, long before the filing of Defendant Robinson's motion for summary judgment, Plaintiff served a First Set of Interrogatories that required him to respond to several interrogatories regarding identification of potential witnesses. Interrogatories 3, 5, 8, 15, 22, Exhibit A (Interrogatories) at 4-8. These interrogatories were "continuing in character," and Defendant Robinson was

obligated to "promptly file supplementary answers if you receive further or different information before trial." *Id.* at 1. "Identifying" an individual required Defendant Robinson to state the "full name, home address, business address and telephone numbers at home and business" for the individual. *Id.* at 2.

…

Defendant Robinson did not identify a single potential witness in discovery, including Mr. Bolden and Mr. Aaron. To sufficiently identify Mr. Bolden or Mr. Aaron, Defendant Robinson would have had to, at a minimum, identify the witness by full name, home address, business address, and telephone number, and provide a statement regarding the subject matter that Defendant Robinson alleges he possesses. Defendant Robinson did not do so.

…

Even if Defendant Robinson were to attempt to shield himself behind any other Defendant's interrogatory responses—which he cannot, as such response was not incorporated within his own and could not have absolved him of his own obligation to respond completely and appropriately to discovery requests—neither Mr. Bolden or Mr. Aaron were ever identified as a witness to any relevant matter on January 9, 2021, when Mr. Young was booked into DCDC. Defendant Dorchester County, similar to Defendant Robinson, simply responded by citing Fed. R. Civ. P. 33(d) and adopting and incorporating other Defendants' responses. Exhibit D (County Response). Defendant Batson identified Mr. Bolden as follows: Corrections Officer Timothy Bolden: C.O. Bolden assisted Defendant Batson in performing CPR until EMS arrived.

Exhibit E (Batson Response) at 3. In other words, Defendant Batson solely identified Mr. Bolden as having discoverable information related to his actions on January 10, 2021, after Mr. Young's body was discovered. In any event, Defendant Batson also failed to properly identify Mr. Bolden, including nothing more than his name.

As for Mr. Aaron, ***no defendant ever identified him as a witness with any relevant discoverable information.***

(ECF No. 121 at 9-12) (emphasis in original).

Defendant Robinson filed a combined memorandum in opposition to both of Plaintiffs' post-summary judgment motions.  (ECF No. 124). There, Defendant Robinson argues that disclosure was sufficient because "Plaintiff had the same documents that Robinson and the other defendants had. The critical incident review report that Plaintiff refers to in his Motion to Strike (that Plaintiff obviously had), was the same document from which the defense identified Officers Aaron and Bolden as potential witnesses." *Id.* at 16.

26

It is worth addressing that Defendant Robinson uses both affidavits to challenge the issue of Defendant Robinson's knowledge that Mr. Young presented a risk of suicide when Trooper Grafton met him at the Sallyport. (ECF Nos. 97-14, 119-1).   While their testimony is not dispositive at the summary judgment phase, the Court recognizes that such testimony is a central issue in the case.  *See supra* Section III.A-III.B.   Indeed, the disputed issue of knowledge that Mr. Young presented a suicide risk is of great important to many of the present claims.   The Court trusts Defendant's representations regarding his good faith efforts to comply with the discovery rules and provide accurate and continuing responses to Plaintiffs' interrogatories.   However, it is clear that at the very least, whether Defendant Robinson properly responded to Plaintiffs' interrogatories is a matter of controversy. (ECF Nos. 121, 127).   Thus, if Defendants intend to call Mr. Bolden or Mr. Aaron to testify, Plaintiff shall have an opportunity to engage in limited discovery to explore the contents of the affidavits.

In sum, Plaintiffs' Motion to Strike (ECF No. 121) is DENIED in part and GRANTED in part, such that Plaintiffs may depose Mr. Aaron and Mr. Bolden, shall either be a potential witness at trial.

## IV.    CONCLUSION

(1) For the foregoing reasons, Defendant Batson's Motion for Summary Judgment (ECF No. 94) is DENIED;

(2) Defendant Dorchester County's Motion for Summary Judgment (ECF No. 96) is DENIED;

(3) Defendant Robinson's Motino for Summary Judgment (ECF No. 97) is DENIED;

(4) Plaintiffs' Conditional Motion to Amend/Correct (ECF No. 120) is GRANTED;

(5) Plaintiffs' Motion to Strike, or in the alternative, for Limited Discovery and a Sur-Reply (ECF No. 121) is GRANTED in part such that Plaintiff may conduct limited discovery if Defendants intend to call Mr. Aaron and Mr. Bolden to testify, and it is otherwise DENIED; and

(6) The parties are hereby directed to confer and jointly inform the Court within fourteen (14) days from the date of this Memorandum Order and Opinion whether there is mutual desire to participate in another settlement conference with Judge Austin before proceeding to schedule a trial and related dates.


Date: <u>January 7, 2026</u>                    <u>        /s/                   </u>
                                                J. Mark Coulson
                                                United States Magistrate Judge